**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Dan Abelmann and the Estate of Leanne Abelmann, as successor-in-interest to Leanne Abelmann, deceased | ) ) ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) | **ORDER  RE MOTIONS** |
| | ) | **IN LIMINE RELATING** |
| vs. | ) | **TO DAMAGES CLAIMED** |
| | ) | **BY SMARTLEASE** |
| SmartLease USA, LLC, | ) | |
| | ) | |
| Defendant, Counterclaimant, and Third-Party Plaintiff, | ) ) | |
| | ) | Case No. 4:14-cv-040 |
| vs. | ) | |
| | ) | |
| Executive Housing Solutions, LLC; Ray Wurth, Don Gibson, and Richard Church a/k/a Chad Church, d/b/a Executive Housing Solutions, LLC; Ray Wurth, Don Gibson, Richard Church a/k/a Chad Church, | ) ) ) ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## I.    BACKGROUND

### A.    SmartLease leasing 110 acres from the Abelmanns

In 2011, two Rapid City, South Dakota businessman—Anthony Marshall (real estate broker/residential home developer) and Kent Guthrie (residential home builder)—were looking for opportunities to develop housing in northwestern North Dakota during the height of the Bakken oil boom.  Through an acquaintance, they learned about a farm-ranch owned by plaintiff Dan Abelmann located about 3½ miles north of the small town of Alexander, North Dakota on U.S. Highway 85. Alexander is located approximately midway between the much larger communities of Williston and

1

Watford City.

In the fall of 2011, Marshall and Guthrie traveled to North Dakota to meet with Abelmann and his wife Leanne.[1]  They discussed with them the possibility of using 110 of their acres to develop a high quality RV/mobile home park with the possibility of commercial development down the line.  (Doc. Nos. 199-5, pp. 6–11, 23–28; 199-6, pp. 35–36, 41).

When the Abelmanns appeared receptive, Marshall and Guthrie enlisted the assistance of Steve Furst, who had recently returned to the United States after working in Afghanistan and who had real estate experience, to be the onsite person working on the development.  The three of them formed SmartLease USA,. LCC ("SmartLease") with each having an equal membership share and a minimum capital contribution of $50,000.  (Doc. Nos. 199-5, pp. 8–9, 12, 51–52; 199-6, pp. 25–26; 199-7, pp. 17–22, 64–68).

On December 18, 2011, SmartLease entered into a written agreement to lease 110 acres of the Abelmanns' land and obtain certain rights with respect to a gravel pit located several miles away.  SmartLease was the principal drafter of the lease.  (Doc. Nos. 199-5, pp. 70–71).

The lease with the Abelmanns was for an initial five-year term beginning November 1, 2011, and ending October 30, 2016.  The lease granted SmartLease an option to renew for successive three-year terms for up to 39 years.  Under the lease, SmartLease obtained:

- Use of the leased premises for "use as a short/long term RV (recreational vehicle), mobile home, cabin units, and truck parking."

- The right to construct a sewage treatment system on the premises.

---

[1]  Leanne Abelmann passed away after the commencement of this case and now what were her interests are being represented by her estate.  For ease of reference, Dan Abelmann and the estate of Leanne Abelmann will collectively be referred to herein the as the "Abelmanns."

- Use of one of the Abelmanns' wells for water for the first 50 units.

- The right to gravel from an off-lease pit owned by the Abelmanns for development of the leased premises as well as the right to process additional gravel and scoria at its expense for sale to third parties and split 50/50 with the Abelmanns the net profit from such sales.[2]

- Peaceable and quiet enjoyment of the premises free from eviction if SmartLease paid the rent and other charges provided under the lease and otherwise fully and punctually performed the terms and conditions of the lease.

- The right to assign the lease as well as sublease the premises but only upon 30-days notice to the Abelmanns.

In exchange, SmartLease agreed to:

- Use and occupy the leased premises "for the purposes of operating a high quality, clean and professionally managed RV/mobile home/cabin park, truck parking and supporting services."

- Comply with all federal, state, and local laws, orders, and regulations and not use the leased premise for an unlawful purpose.

- Carry public liability insurance in specified amounts covering the operations conducted on the lease premises and naming the Abelmanns as additional insureds.

- Pay Abelmanns monthly rent consisting of $75 per month for each housing unit

---

[2]   The Abelmanns and the principals of SmartLease subsequently agreed to form and become members of a separate entity, Ranger Rock, LLC, that apparently became the vehicle for exercise of the rights of the parties with respect to the gravel pit and its future development. (Doc. No. 199-7, pp. 36–38).  Disagreements between the parties with respect to the operation of Ranger Rock led to the filing of a separate action in this court  that  ultimately was dismissed without prejudice on jurisdictional grounds. Furst et al. v. Abelmann et al., Case No. 1-17-cv-85.  The court is not aware of the present status of these disputes.

rented for 30 days, $37.50 per month for each housing unit rented for 15 days, and

10% of any income received from truck parking.

• Deposit in a reclamation fund $25 per month for each housing unit rented for 30

days, which fund was to be used at the end of the lease for reclaiming the leased land

to its original condition or for any other purposes elected by the Abelmanns.

The lease also provided that time was of the essence with respect to all of its provisions and that it

represented the entire agreement between the parties.  (Doc. No. 149-1).

Notably, the lease did not authorize use of the 110 acres for commercial purposes, such as

restaurants, motels, gas stations, etc.  Presumably, the only way SmartLease could use the leased

premises for these purposes would be to get an amendment or exercise the option to purchase all or

part of the leased acreage that it later acquired.  Also, the lease did not require the Abelmanns to

provide notice of a claim of breach and an opportunity to cure before a default could be declared.

The only provision addressing default required a mediation conducted by a third party prior to the

institution of any legal action.

### B.    Short-term rental for truck parking and creation of a  "dry" RV park

Upon execution of the lease, SmartLease immediately leveled and graveled an approximately

5-acre pad, initially for short-term truck parking and then for use primarily to rent to RV tenants for

longer terms (herein the "RV Park").  Given SmartLease's limited financial resources, most of the

work was done either by the principals themselves or by barter in the form of trading rent free space

on the leased acreage in exchange for work on the RV Park.  SmartLease's game plan, given its

limited resources, was to develop the 110 acres in phases using income generated from each phase

as well as bartering opportunities to complete the next phase but at all times looking to take on a

partner with deep pockets.  (Doc. Nos. 199-5, pp. 39–42, 58–69; 199-7, pp. 41–61, 94–101).

SmartLease provided very limited services to the RV Park tenants—some sooner than others. SmartLease installed electrical pedestals that multiple RVs could plug into for single phase electrical service that was limited to 110 volts.  Water eventually was provided by a tanker truck parked on the premises.  The restroom facilities were porta-potties that were placed at certain points on the pad. And, in mid-2012, a trailer unit operated by a third party was put on the pad to provide showers. Smartlease never got to the point of providing separate water and sewer service for the RVs. Rather, it operated what has been termed a "dry" RV park. In short, conditions were primitive and less than desirable if there were other alternatives—particularly during a North Dakota winter.  (Doc. Nos. 199-5, pp. 40–42, 193–95; 199-7, pp. 99–123).[3]

SmartLease claims the reason why it never upgraded the RV Park was because in 2012 it became apparent the market for RV housing was becoming saturated.  SmartLease claims it turned its attention instead to developing a mobile home park for up to 300 units along with the possibility for commercial development.  This eventually would have required redoing the area, including removing any improvements.  SmartLease claims it discussed the situation with the Abelmanns and that they were onboard with operating the RV Park as it was and using whatever cash could be generated from the RV Park to assist in funding more permanent housing and provide the Abelmanns with some income during the interim.  (Doc. Nos. 195, pp. 187–90; 199-7, pp.113–120, 142–44).

There is evidence that going into the latter part of 2012 occupancy in the RV Park decreased

---

[3]  For a period of time early on, SmartLease allowed RVs to park in two other areas that were not improved and for which no services were provided—not even electricity.  Mainly, these areas were used by those who needed a place to park for a couple of days and the amount charged was less than for renting space on the developed pad.  (Doc. Nos. 199-5, pp. 41–42; 199-7, pp.94–101).

because of the primitive conditions and a softening of the market.  In fact, there was some discussion among the SmartLease principals going into the winter months as to whether it made economic sense to keep the RV Park, such as it was, open over the winter unless it could maintain a minimal level of occupancy.  (Doc. No. 199-5, pp. 191–93).

Further, there was a "sword of Damocles" overhanging the RV Park since it lacked a state required license for its operation.  N.D.C.C. § 23-10-3.  SmartLease had been advised by the North Dakota Department of Health ("NDDOH") as early as October 2011 of what was required to obtain licenses for both RV and mobile home parks.  This included copies of the relevant statutes and regulations as well as the requirement that plans for any proposed developments be provided to the NDDOH prior to commencement of construction.  However, SmartLease never followed through to obtain the required license for the RV Park.  Further, this was not something that SmartLease simply forgot about as it proceeded with development.  In an email sent by Furst to Guthrie and Marshall on January 21, 2012, Furst discussed the requirement for obtaining a license and asked what should be the plan of action.  Then, later in the beginning of 2013, SmartLease represented in a sales agreement discussed in more detail later that it did not have the required license to operate but stated the necessary approvals were being sought.  That representation appears to have been questionable representation given the evidence that, whenever State officials inquired of SmartLease what the status of the Park was, it either put them off or did not indicate it was actually operating an RV park.  (Doc. Nos. 160-8; 160-10; 160-11; 199-6, pp. 131-83, 202–03; 199-7, pp. 98–105; 202–03; 211-5, p. 12).

As discussed in more detail later, SmartLease continued to operate the RV Park in 2013 and 2014 after the Abelmanns declared the lease had terminated, albeit subject to interference by the

Abelmanns—at least initially.  There is evidence that occupancy in the Park dwindled with a concomitant decline in revenue and that, at least by May 2014, SmartLease stopped taking in new renters.  SmartLease contends this was due to Abelmanns' interference, including that the renters refused to pay SmartLease after the Abelmanns directed that payments go to them.  However, SmartLease did not take any action against the renters who did not pay after it prevailed in the district court. Further, it is difficult to understand why *new* renters would pay the Abelmanns rather than SmartLease, particularly after the district court's decision.  The actual facts appear to be that the reductions in Park occupancy were due in substantial part to other factors, including the primitive conditions, a softness in the market for RV space rentals, SmartLease's decision to devote its limited resources to mobile home housing rather than provide better amenities, and a concern in 2014 that county officials might not grant the requested zoning for their planned mobile home park and commercial development  if SmartLease continued to promote an unlicensed operation.  (Doc. No. 137-2, p.2;199-5, pp. 178; 199-8, pp. 156–60, 204–05).

C.    **The efforts to develop a mobile home park and the sublease to EHS**

While SmartLease turned its attention to developing the leased acreage for a mobile home park that could accommodate up to 300 units as well as space for commercial development, it lacked the financial resources to complete a development of that size, which could run into the millions for roads, water, sewer, and electricity. (Doc. No. 199-5, p. 247–48, 270–71; 199-7, pp. 281–82).  What SmartLease attempted to do  in 2012, however, was to begin work on an area of the leased premises separate from the RV Park upon which it planned  to construct 17 mobile home pads with water, sewer and electrical service.  SmartLease leveled an area for the 17 pads.  It also ran a water line to the leveled area and installed curb-stops on the back lots.   But that was as far as it got and even

much of that work was done by barter, *i.e.,* providing rent free space on the RV pad in exchange for the work that was performed.  (Doc. No. 199-5, pp. 42–43, 203–04).  Further, it is unclear from the record now before the court whether SmartLease had initiated the state licensing process for this limited mobile home development, including submitting its plans to the State Health Department prior to commencing construction.

One of the things that was required for a large mobile home park was a sewage collection and disposal system.  In an attempt to solve the treatment part of the puzzle, SmartLease put $10,000 down on an option to purchase a package sewer treatment plant for $120,000, which ultimately it never exercised.  (Doc. Nos. 213-2; 213-4).  Later in 2012, SmartLease entered into negotiations with third-party defendant Executive Housing Solutions, LCC ("EHS") to obtain sewage treatment capacity.  EHS is a limited liability company whose principals are third-party defendants Ray Wurth ("Wurth") and Don Gibson ("Gibson").  The result of the negotiation was a 1½ page "back of the napkin" agreement executed in mid-October 2012 ("EHS Agreement").  (Doc. Nos. 199-6, pp. 96–121).

The EHS Agreement stated it was not complete but binding so far as it went.  Also, with respect to a number of critical points, it was vague and indefinite. The following is a summary of the salient provisions.

- •   EHS agreed to finish the infrastructure on the 17 lots that SmartLease had graded for mobile homes as outlined in a scope of work that the agreement contemplated would be attached as an addendum but apparently never was.  EHS agreed to lease 14-15 of the lots it helped finish and pay $1200 per month once trailers were placed on the pad.  It is not clear from the literal text of the agreement, however, whether the

$1200 per month is per lot or for all of the lots. Also, the trigger for when the rent obligation(s) begin to accrue might be susceptible to multiple interpretations. That is, whether the obligation commences for all of the lots with the placement of the first trailer or whether the obligation for each lot begins with the placement of a trailer on that lot.

• In exchange for EHS finishing the 17 lots and occupying most of them, SmartLease agreed to lease EHS for an indefinite term 5-8 acres for construction of a sewage treatment plant. As additional consideration for this sublease, EHS agreed to allow SmartLease to run sewer lines to its "park" and dispose of waste at no charge, but subject to the following vaguely-worded capacity limitation(s) that may be subject to multiple interpretations:

> If SmartLease adds more than 100 (or gallons per day?) lots per year, for the first 3 years, the terms of the sewer plant will need to be re-negotiated. EHS is building the sewer plant to generate income. if more that 100 units per year are added, it will substantially diminish EHS's ability to make money.

(spelling errors and parenthetical in the original). EHS also agreed to pay a 5% royalty on its net income earned from operating its sewage treatment facility beginning 36 months after it commenced operation.

• SmartLease would provide "snow road snow removal" and provide water. EHS would be responsible for electricity, TV, internet, property taxes, and other fees associated with the "sewage plant improvements" and maintenance of the east road off of county road 17.

• Finally, the sublease provided no concrete milestones for performance, stating only

9

that time was of the essence and thereby creating additional uncertainty over what would be reasonable under the circumstances.

(Doc. No. 149-1).[4]

EHS completed construction of its waste processing facility in the first quarter of 2013 and it became commercially operational in May. (Doc. No. 165-1, p. 18). The additional work required to make the 17 mobile home lots operational, however, was never completed. (Doc, No. 199-8, p. 207). This is the basis for SmartLease's breach of contract claim against EHS.

SmartLease seeks damages for the rent it claims would have been due on the lots EHS agreed to complete and occupy.[5] EHS contests both liability and the amount of damages SmartLease is claiming. EHS contends that SmartLease failed to provide a sufficient base to support the placement of mobile homes when it prepared the area for the 17 mobile home lots as well as perform other obligations, including snow removal. EHS claims that these breaches excused any lack of performance on its part. EHS also argues that it is entitled to setoff against any rental amounts being claimed certain of SmartLease's bills that were paid by EHS. (Doc. No. 165-1, pp. 100–04,

---

[4] It does not appear that SmartLease gave the Abelmanns 30 days advance notice of the sublease as required by its lease. Further, EHS planned to make its money by processing waste from third parties. It is highly questionable whether the lease could fairly be read to encompass the construction and operation of a commercial sewage processing facility that would process off-lease waste—not only because of the additional environmental burdens this would impose but also the nuisance of the continual truck traffic hauling in third-party waste. Absent something more, the undersigned would not read the Abelmann lease as permitting such activity. The salient issue in this case, however, is likely not what the lease language permits but whether the Abelmanns acquiesced to EHS's construction and operation of its sewage treatment facilities and waived any claim that it amounted to a breach of the lease to SmartLease.

The same is true for the other instances in which SmartLease's performance did not square with the terms of the lease. Putting aside Abelmanns' claims of breach of the performance standards for a clean and professionally run operation over which there *might* be some dispute, SmartLease had not as of March 1, 2013, procured the liability insurance required by the lease. (Doc. No 199-7, pp. 123–24). Also, as discussed earlier, the RV Park was being operated unlawfully.

[5] As noted later, this claim appears to be inconsistent with SmartLease's claim it was constructively evicted as of March 1, 2013, and is now entitled to an amount of damages premised upon it having lost its interest in the property as of that date.

111–29).

**D.    The amendment of the lease on the 110 acres extending its term and providing an option to purchase**

SmartLease contends it received several "offers" during the later part of 2012 that would have resulted in it and the Abelmanns making millions had any one of them come to fruition. Any potential deal, however, required SmartLease to obtain better control of the leased property. To this end, SmartLease approached the Abelmanns and explained the reality of the situation, which was that any further development of the property required a longer lease and likely also the ability to acquire ownership of part or all of the leased property. SmartLease further communicated that it had received strong expressions of interest on deals that would result in both parties earning substantial amounts of money. This resulted in an amendment of the Abelmann lease dated November 10, 2012, that extended the ability to keep renewing up to 99 years and a 36-month option to purchase some or all of the 110 acres for $20,000. (Doc. Nos. 149-3; 199-5, pp. 116–26, 133–43; 199-7, pp. 176–90).

**E.    The purchase agreement with DG Developments and other third-party expressions of interest**

One of the parties that SmartLease was talking to in the later part of 2012 was DG Developments, LLC (also referred to as the "Hegg Group"). After securing the amendment of the Abelmann Lease that included the option to purchase all or part of the 110 acres, SmartLease finalized a purchase agreement with DG Developments to flip the property for a purchase price of approximately $5 million dollars. Had DG Developments actually purchased the property, this would have netted Smartlease more than $2.5 million after paying the Abelmanns $2.2 million for the property. (Doc. No. 211-5).

11

The reality of the DG Developments purchase agreement, however, was that it was little more than an option. This is because there were a number of contingencies as well as a provision that gave DG Developments the ability to back out within a prescribed period for any or no reason. (Doc. Nos. 199-6, p. 206–07; 211-5).

After conducting its due diligence, DG Developments did not proceed with the purchase. There is evidence that at least one of the reasons was its conclusion that the capacity rights for sewage treatment under SmartLease's sublease with EHS were not sufficient for the size of development it was planning (250-300 residential units) and it was unable to obtain a commitment for additional capacity from EHS. (Doc. Nos. 199-6, pp. 212–15; 199-8, pp. 145– 46, 185–87, 297–98). As noted earlier, Smartlease obtained the right to sewage treatment for its development but subject to a maximum of bringing on line not more than 100 lots each year for three years. Also, there is some evidence that EHS was contending the agreement was subject to an additional capacity limitation of 100 gallons per lot per day, which may have further limited the number of lots that could be serviced as a practical matter since there is some evidence that an estimated minimal flow rate for a mobile home is 150 gallons per day. (Doc. Nos. 199-5, p. 220;199-6, pp. 212–13). Finally, there is also evidence that DG Developments was considering up to nine other properties and there was an underlying concern of at least one of SmartLease's members that other properties might be more desirable. (Doc. Nos. 199-6, pp. 208–09; 199-8, p. 293).

SmartLease has acknowledged that, by the time the Abelmanns sent out its notice of lease termination on March 1, 2013, the discussions with DG Developments had switched to the possibility of the parties entering into a joint venture for development of the property and that it was not the lease termination notice that resulted in DG Developments backing out of its purchase.

(Doc. Nos. 199-5, pp. 286–87; 199-6, pp. 210–30, 276–78, 301–04; 210, pp. 2–3).  As discussed later, however, the discussions with DG Development about a joint venture were nothing more than discussions.  No agreement was reached—not even a handshake deal.  (Doc. Nos. 199-5, pp. 286–88; 199-6, pp. 217, 230). SmartLease claims that the joint venture discussions did not proceed further because of the Abelmanns' lease termination notice and eviction action.  But, even if a joint venture agreement had been consummated, there is no reliable basis for concluding it would have been profitable for SmartLease.  This point will be returned to later.

SmartLease had discussions with several other individuals or entities during the same time frame of the later part of 2012 and early 2013, including EHS, for either a sale of part or all of the Abelmann property, some sort of joint development, or a combination of the two.  Several of the discussions resulted in written proposals that were not binding and contemplated an actual agreement.  In other words, they amounted to little more than expressions of interest.  (Doc. Nos. 211-3; 211-4, 211-5, pp. 1–10; 211-6).  SmartLease decided not to pursue the discussions with the other third parties any further.  The reasons why included that SmartLease did not believe the offers were real or that any deal that might be struck would not be as favorable as the one it was negotiating with DG Developments. (Doc. Nos. 199-5, pp. 215–17, 286–87; Doc. Nos. 199-6, pp. 184–98).

**F.    Abelmanns' March 1, 2013 lease termination notice, the state eviction action, and the initiation of this action**

On March 1, 2013, the Abelmanns served SmartLease with notice that it deemed its lease to have terminated based upon a number of alleged defaults.  There is evidence that, upon service of the notice, the Abelmanns directed the RV tenants to pay them directly and took other steps that infringed upon SmartLease's use of the premises.  (Doc. Nos. 149-20; 149-21).  Then, in May 2013,

13

the Abelmanns commenced an eviction action in state district court.  (Doc. No. 137-7).

SmartLease disagreed that it was in substantial breach of the lease and that eviction was not appropriate.  The North Dakota Supreme Court summarized the respective positions of the parties leading up to the eviction hearing held by the state district as follows:

[¶ 7] According to the Abelmanns, SmartLease agreed to develop the leased land into a high quality, clean, and professionally managed full service RV and mobile home park for housing and accommodations for the labor force in northwestern North Dakota. They claimed SmartLease started to develop the land, but thereafter neglected its obligations under the written lease. They asserted SmartLease failed to pay them rent or the security deposits required by the lease and failed to provide proper management for the land. According to them, a property manager hired by SmartLease, Aaron Smith, failed to provide proper on-sight management for the property and eventually quit, which resulted in no on-site management for the property. They claimed SmartLease asked Leanne Abelmann to collect rent from tenants while SmartLease sorted out the management problems. They also asserted SmartLease failed to: (1) maintain roads for the property; (2) install and maintain appropriate sewage facilities; (3) install appropriate electrical service for the property; (4) maintain portable toilets; (5) maintain proper signage for the RV park; (6) obtain financing to properly develop the property; (7) obtain proper insurance; and (8) professionally manage and develop the property. They asserted they provided SmartLease with written notice of termination of the lease in February 2013, and claimed SmartLease refused to vacate the premises and attempted to transfer the lease to a third party.

[¶ 8] According to SmartLease, it never anticipated the RV park would become fully operational immediately and it diligently developed the property from farmland into an RV park, including investing more than $500,000 in the project, having the land rezoned from agricultural to residential use, generating income from camper and truck parking by February 2012, and arranging for sewage and water facilities on the land. SmartLease claimed Furst lived with the Abelmanns while he managed the property from the fall of 2011 until he became sick in September 2012, and Aaron Smith then managed the property until he quit working for SmartLease in January 2013. SmartLease asserted it had Leanne Abelmann assume management of the property after Aaron Smith quit in January 2013. SmartLease claimed it was current on its rent payments to the Abelmanns until Leanne Abelmann began collecting rent from the tenants and SmartLease asserted its efforts generated substantial income for the Abelmanns, including more than $43,000 in rent from the RV park and more than $270,000 in gravel sales. SmartLease asserted its efforts resulted in an offer to purchase the land in January 2013 for nearly 5 million dollars. SmartLease also claimed the Abelmanns attempted to terminate the lease only after learning the property, which was subject to SmartLease's option to purchase for $20,000 per acre, had substantially increased in value.

Abelmann v. SmartLease USA, L.L.C., 2014 ND 227, ¶¶ 7–8, 856 N.W.2d 747.

Following the eviction hearing, the state district court on August 26, 2013, concluded there

14

had not been a material breach of the Abelmann lease that justified eviction. The court further concluded that any breach which might have caused a loss could be recovered by the Abelmanns in an action on the contract. (Doc. No. 137-4).

The Abelmanns appealed. On December 18, 2014, approximately 15 months after the district court made its ruling, the North Dakota Supreme Court reversed the decision, concluding that the district court had not set forth in its opinion findings sufficient to justify its decision. The case was remanded to the district court to determine whether SmartLease had failed to pay rent as alleged or committed any other material breach of the lease. 2014 ND 227, ¶¶ 10-22.

While the appeal to the North Dakota Supreme Court was pending, the Abelmanns filed this action on April 14, 2014. (Doc. No. 1). SmartLease filed a motion to dismiss and this court deferred ruling pending a decision by the North Dakota Supreme Court. (Doc. Nos. 17, 28).

After the North Dakota Supreme Court's remand of the state case, the Abelmanns asked the district court to dismiss the eviction action without prejudice. The Abelmanns argued that, since the federal action was broader in scope and not confined solely to the question of eviction, proceeding in one action in federal court would promote judicial economy. The state district agreed and on March 3, 2015, dismissed the state action "without prejudice." (Doc. No. 137-6). SmartLease did not appeal.

On March 23, 2015, the Abelmanns and SmartLease stipulated to a withdrawal of the motion to dismiss filed in this action. (Doc. No. 35). The Abelmanns subsequently filed an amended complaint. SmartLease answered, asserted a counterclaim against the Abelmanns, and initiated its third-party action against the third-party defendants. (Doc. Nos. 37, 39).

Since that time, there have been further amendments to the pleadings including Abelmanns

15

bringing a supplemental complaint for additional relief arising out of McKenzie County have sued all the parties in this case claiming that the RV Park and EHS's sewage treatment facilities are nonconforming uses and must be removed.  While the RV Park and EHS's facilities were initially constructed prior to McKenzie County having its zoning ordinance in place, McKenzie County is claiming that both were expanded after the enactment of the zoning ordinance which then, according to it, subjected the facilities to its zoning ordinance.  (Doc. Nos. 131, 131-4).  The court's understanding is that this action is still pending.

### G.    SmartLease's tort claims against the Abelmanns and the third party defendants

During the state-court eviction hearing, Leanne Abelmann falsely testified about several matters including that she and her husband had no contact with EHS prior to issuing the lease termination notice and that they alone had drafted it.   (Doc. No. 149-2, pp. pp. 46–47, 50–52). SmartLease later learned that Wurth (a principal of EHS) and Chad Church (an EHS employee) had several meetings with the Abelmanns prior to the Abelmanns issuing the March 1, 2013, lease termination notice.   There is evidence (most of which is indisputable) that:

- The meetings focused upon whether the Abelmanns had grounds to terminate their lease with  SmartLease.

- During one of the meetings, Wurth offered to have EHS's attorneys review the lease to see whether there was grounds for termination, and the Abelmanns availed themselves of this assistance.

- Church assisted the Abelmanns in marshaling proof of SmartLease's alleged breaches and appears to have been the principal drafter of the lease termination notice.

(Doc. Nos. 149-10, pp. 41–42, 50–54; 149-11; 149-12; 149-14).

SmartLease contends the Abelmanns were not dissatisfied with its performance for the reasons it articulated in the state court proceedings as summarized above by the North Dakota Supreme Court.  SmartLease claims the Abelmanns would not have served the lease termination notice and initiated the eviction action but for EHS's enticement that they do so with the benefit to the Abelmanns being EHS's support in the eviction action and promises it could do better than SmartLease in developing the property.

EHS's response appears to be that there was nothing inherently wrong in working with the Abelmanns given EHS's position in light of what it contends was the Abelmanns purported dissatisfaction with SmartLease and what appeared to it to be SmartLease's deficient performance under its lease with the Abelmanns. The problem for EHS was that it had only a sublease.  If the Abelmanns sought to terminate their lease with SmartLease and were successful, EHS stood to lose its rights to be on its subleased property along with its large investment in the sewage treatment plant it was in the process of completing.  EHS contends that, given the uncertainty created by SmartLease's allegedly deficient performance, it was entitled to take proactive steps so long as they did not become tortious, which EHS contends they did not.

The court has concluded, at least as of this point, that the jury will have to decide whether the conduct of EHS and its principals rose to the level of tortious interference with SmartLease's lease rights.

H.   **SmartLease did not relinquish possession of the leased premises after receipt of the lease termination notice and contested the eviction action, arguing the lease was still in effect and it was entitled to specific performance**

There is evidence (most of it indisputable) that, immediately following issuance of the lease

termination notice, the Abelmanns: (1) advised SmartLease that it was no longer welcome on the property and threatened it with criminal trespass; (2) advised one of SmartLease's contractors as well as EHS that the lease had terminated and/or that SmartLease was no longer associated with property; (3) advised existing RV tenants that SmartLease was no longer in control of the RV Park and that rents should be made payable to them; (4) retained RV Park rentals that were paid to them, including some from EHS; (5) for a period of time locked SmartLease out of a trailer used as an office; and (6) possibly tore down a SmartLease marketing sign.  However, there is no evidence that SmartLease was physically barred from the property and it appears from the deposition testimony of the SmartLease principals that the active attempts to interact with RV tenants was immediately following the lease termination notice and did not continue after the district court ruled in SmartLease's favor.  (Doc. Nos. 199-5, pp. 169–80; 199-6, pp. 73–80).

Despite the lease termination notice and the above acts of interference,  SmartLease did not elect at the time to treat the situation as a constructive eviction and relinquish possession of the property.  Instead, throughout the protracted litigation in the state courts that followed SmartLease contended the Abelmanns had no legitimate basis for terminating the lease and fought eviction.  In fact, SmartLease was the prevailing party for some 15 months after the state district court concluded the lease had not terminated and there was no basis for evicting SmartLease.   SmartLease's principals have all testified  that the district court's ruling reinforced their belief that SmartLease was rightfully in possession and the lease was still in effect. (Doc. Nos. 199-5, pp. 158–71; 199-6, pp. 300; 199-7, pp. 265–71; 199-8, pp. 96, 140, 169).  For example, Marshall testified:

Q      Mr. Marshall, real quickly.  You mentioned a couple of times that the Abelmanns evicted SmartLease.
            You don't believe that SmartLease has ever been evicted from the property do you?

18

A       We received a letter a notice to evict and there was a trial and the trial overturned that eviction.  So we have not been evicted from the property.

Q       All right.  And never have been up to this point, correct?

A       That's my understanding.

Q       All right.  So when you say they evicted us, you're talking about attempted to evict, correct?

A       Yes.

Q       And that's true for all of the answers you gave today?

A       Yes, the attempt to evict.

(199-6, p. 300).

Further, SmartLease did not change its position after the North Dakota Supreme Court reversed the district court and remanded the case to the district court for further proceedings. Likewise, the same is true after the dismissal of the state court action and the Abelmanns continued with their eviction efforts in this court.  For almost the entirety of this action, SmartLease has continued to assert that the lease had not terminated and requested that this court order specific performance of its lease rights—even as late as November 2019.  (Doc. Nos. 68; 157, p. 20).

Consistent with its understandings and litigation position, SmartLease never relinquished possession of, or otherwise abandoned, the leased premises.  In fact, SmartLease has acknowledged that, after receipt of the lease termination notice,  it:

• Hired Gary Ashley to manage the RV Park for a period of time and continued to pay bills for the Park.  (Doc. No. 149-7).  Then, after prevailing before the district court, SmartLease on October 31, 2013, partnered with Peterson Financial (an entity owned by Erik Peterson) for continued management, development, and marketing of the property.  (Doc. Nos. 160-3; 160-5; 199-6, p. 80; 199-7, pp. 266-77; No. 199-8, pp.

92–97, 194–97).

- Continued to maintain the RV Park including trash collection, maintenance of the porta-potties, attempting to keep the site clean of debris and trash, and hauling away abandoned RVs. (Doc. Nos. 137-2, p. 4; 199-8, pp. 200–06)

- Made efforts to collect rent on the RVs and trailers parked on the premises including (1) posting notices on the RVs stating that the rent should be paid to SmartLease and not the Abelmanns, (2) having Peterson frequent the property to count units, take pictures, and take down license numbers to aid in invoicing Park occupants, (3) invoicing Park occupants, and (4) making some person-to-person collection efforts. (Doc. Nos. 199-6, pp. 62–63; 199-7, pp. 266–77; 199-8, pp. 155–57, 164–65, 212–13, 248–53).

- Incurred some $40,000 to $50,000 in expense for a second engineering firm to redo the plans for development of the 110 acres.  (Doc. No. 198, pp. 99-100, 105–11).

- Worked on infrastructure to bring rural water onto the lease acreage.  (Doc. Nos. 165-1, pp. 189–90; 199-8, pp. 98–100).

- Submitted a request to the county planning and zoning commission to re-zone the property to support its most recent plans for development that included both residential housing and commercial uses as well as attending a hearing on the request.  (Doc. No. 199-8, pp. 103–115).[6]

---

[6]  Dan Abelmann attended the hearing held by the county planning and zoning commission in mid-2014 and opposed the change in zoning from agricultural to that which was then being requested by SmartLease.  Abelmann's opposition resulted in SmartLease's request being tabled. This is troublesome given that  the lease to SmartLease was for the explicit purpose of residential development.  On the other hand, while the record is somewhat muddled, it appears that SmartLease's request included zoning that would allow for some commercial uses and the lease at that point did not

(continued...)

- Worked to market the property and/or attract investors to assist with further development. (Doc. Nos. 160-2; 160-5; 199-7, pp. 268-69; 199-8, pp. 194, 213–17, 252–55).

- Obtained a liability policy required under its lease that it had neglected to obtain prior to March 1 2013, and kept that insurance in effect at least until most recently. (Doc. No. 199-6, p. 94).

- Vis-a-vis EHS, continued to assert that its lease with the Abelmanns remained in effect, pressed EHS for performance of its obligations under the sublease, and eventually sued EHS, seeking relief that, in part, is consistent only with it having retained possession.  (Doc. Nos. 39; 160-1; 160-6).

In short, while the Abelmanns did commit acts of interference with SmartLease's quiet enjoyment and possession, they never physically barred SmartLease from the leased acreage and the indisputable evidence is that SmartLease continued to occupy, use, and market it consistent with its position that the lease had not terminated and that it was entitled to specific performance.[7]  As

---

[6](...continued)
authorize commercial development.  Further, SmartLease never proceeded further with the zoning process although it had the right to do so.  In fact, there is some evidence that later in 2014 it requested that its application be further tabled because of the pending litigation.  Finally, this alleged act of additional interference on Dan Abelmann's part was more than a year after the lease termination notice, during which time SmartLease had remained in possession.  And, even after Abelmann opposed the zoning, there was no abandonment of the property at that time and SmartLease continued to assert in court that the lease remained in effect and it was entitled to specific performance.

[7]  In fact, in addition to continuing to argue it was entitled to specific performance, SmartLease has admitted in its briefing that it did not abandon the property —at least until not very recently.  In August 2019, the Abelmanns filed a motion for partial summary with this court in which it argued that, even putting aside whether the lease had terminated as of March 1, 2013, SmartLease had effectively abandoned the property as of May 2014 when it purportedly stopped performing its obligations under the lease.  Based on a claimed abandonment as of that time, the Abelmanns requested an order granting them possession of the leased premises and dismissal of SmartLease's claim for specific performance. In its brief in opposition filed on September 2019, SmartLease contended it had not abandoned the property and opposed the court entering an order granting the Abelmanns possession.  (Doc. No. 148).  More particularly, SmartLease wrote:

(continued...)

discussed later, this has consequences for SmartLease's remedies in the event the jury concludes the Abelmanns were not justified in terminating the lease.

I. **The possible lapse of the purchase option as well as the lease and SmartLease finally giving up on its claim for specific performance.**

SmartLease made no attempt to exercise the option to purchase all or part of the leased acreage which expired by its terms if the lease was still in effect as SmartLease was contending at the time. Later, while SmartLease was still maintaining in court that the lease was in effect, SmartLease made no active attempt to renew the lease when its initial five year lease term expired at the end of October 2016.

In a deposition given on October 29, 2019, Marshall stated he believed the lease to have terminated at the expiration of its initial term in October 2016, although this appears to be inconsistent with SmartLease continuing to have argued in court for several years thereafter it was

---

[7](...continued)

[¶65] Under North Dakota law, a lease can only be abandoned by "mutual consent of the parties." N.D.C.C. § 47-16-14. Abandoned thus requires the lessor to show the lessee voluntarily intended to surrender the leased premised to the lessor. Hermon Hanson Oil Syndicate v. Bentz, 77 N.D. 20, 40 N.W.2d 304, 306 (1949). "Unless it appears either by direct evidence or preponderant circumstances that the lessee intended to abandon his lease, the courts will not declare it terminated on that ground. Intention of the lessee to abandon [the] lease is a requisite." Sanden v. Hanson, 201 N.W.2d 404, 409 (N.D. 1972) (citation omitted). "Whether a surrender . . . has occurred is a question of fact." Pierce v. B.P.O. of Elks Lodge No. 1214, 2004 ND 26, ¶ 10, 673 N.W.2d 914.

[¶66] Here, Smart Lease never intended to abandon the Lease. Smart Lease has fought tooth and nail to keep its investment. It wrote letters and emails pleading with the Abelmanns to reconsider the termination. It sent out managers to collect rent to no end after Leanne posted notice to the tenants instructing them not to pay Smart Lease. It resisted the Abelmanns' eviction action in state district court and on appeal to the North Dakota Supreme Court, and it now resists their efforts in this Court. Even to this day, Smart Lease continues to pay to insure the Property.

[¶67] Put simply, Smart Lease has done everything it can to regain control of the Property. Once the Abelmanns repudiated the Lease, Smart Lease could have walked away from the Property, but it chose not to. Smart Lease developed the Property from a hayfield into, at one time, a commercial success. Smart Lease has never given up on the Property. The undisputed facts do not show otherwise.

(Doc. No. 148, pp.21–22). Then, a few months later in November 2019, SmartLease again reiterated it was seeking specific performance of the lease. (Doc. No. 157, p. 20).

entitled to specific performance.  More specifically, Marshall testified:

Q      All right. So if Smart Lease succeeds in its claims against the Abelmanns, Smart
        Lease would vindicate its leasehold rights to the property, including the  option to
        purchase, right?

A      I don't know that to be the case.

Q      Okay. So is Smart Lease suing not to vindicate its  rights under the lease, but just to
        collect damages?

A      That's my understanding of where we are today.

Q      Okay. And you understand that if you got those damages, you would  lose your
        rights to the property?  You don't get both?

A      I would understand one wouldn't get both.

Q      Okay. And if, in fact, you vindicate your rights to  the property, you would be obligated to
        meet all of your obligations to EHS under this agreement, right?

A      I don't know. Or –

Q      I'm sorry. Did you say I don't know or no?

A      I don't exactly know what the status of that is.

Q      Okay.

A      Because our agreement has ended, according to the  terms of our lease.

Q      The Exhibit 54 has ended?

A      No. The agreement with Abelmanns.

Q      Okay. So the agreement between Smart Lease and the  Abelmanns, did Smart Lease
        terminate that agreement?

A      It didn't terminate it, no.

Q      Did not?

A      Did not.

Q      Okay. But the Abelmanns have attempted to terminate it, correct?

A      They've attempted to terminate it, but the initial five year time period has lapsed.

Q        Okay. So, in other words, any way you slice it, that agreement is over?

A        That's the way I understand it.

(Doc. No. 199-6, p. 78).  Also, Marshall's position as to when the lease terminated may be inconsistent with the provision that the lease is renewed for at least an additional 3-year renewal term in the event of a "hold over" by SmartLease.  (Doc. No. 149-1).

Finally, the court need not rule now whether SmartLease had an equitable argument that the option and lease continued without it having to take affirmative action given the acts of the Abelmanns and the pending litigation. This is because SmartLease has now represented in its briefing with respect to the present motions that it has abandoned its claim for specific performance. (Doc. No. 210, p. 2, n.1).

## II.    **DISCUSSION**

There are four motions in limine now before the court that seek to exclude or narrow the damages being claimed by SmartLease, including the exclusion of certain opinion evidence it has disclosed.  The motions are the following:

1.      The third-party defendants' motion to preclude evidence of future lost profits.  (Doc. No. 189).

2.      The third-party defendants' motion to preclude evidence of individual investment damages.  (Doc. No. 209).

3.      The Abelmanns' motion to preclude any evidence of damages.  (Doc. No. 195).

4.      The Abelmanns' motion to preclude any opinion testimony by Eric Peterson.  (Doc. No. 197).

To some extent, the motions are overlapping.  For purposes of resolving the motions, the

court will address certain of the damages claimed by that SmartLease and then address the individual

motions.  Before any of that, however, the court will outline the general provisions of North Dakota

law governing damages.

### A.      North Dakota law governing damages

SmartLease alleges claims for both breach of contract and tort.  N.D.C.C. § 32-03-09 sets

forth the general measure of damages for beach of contract as follows:

> **§ 32-03-09. Measure of damages for breach of contract--Damages must be certain**
> For the breach of an obligation arising from contract, the measure of damages, except when
> otherwise expressly provided by the laws of this state, is the amount which will compensate
> the party aggrieved for all the detriment proximately caused thereby or which in the ordinary
> course of things would be likely to result therefrom. No damages can be recovered for a
> breach of contract if they are not clearly ascertainable in both their nature and origin.

With respect to the requirement that contract damages must be "ascertainable, the North Dakota

Supreme Court has clarified that this goes to the fact of damage and not the amount.  Martin v.

Trinity Hosp., 2008 ND 176, ¶¶ 29-31, 755 N.W.2d 900 ("Martin").  Damages may not exceed,

however, what would be gained by full performance of the obligations.  N.D.C.C. § 32-03-06.

The general measure of damages for tort claims is set forth in  § 32-03-20:

> **§ 32-03-20. Measure of damages for tort**
> For the breach of an obligation not arising from contract, the measure of damages, except
> when otherwise expressly provided by law, is the amount which will compensate for all the
> detriment proximately caused thereby, whether it could have been anticipated or not.

This is a broader measure of damages than for breach of contract with the North Dakota Supreme

Court having described the difference as follows:

> There is a clear distinction between the two theories of recovery "in that damages not even
> anticipated are recoverable in tort, while only such damages as were reasonably
> contemplated by the parties at the time of entering into the agreement are recoverable for a
> breach [of contract]." 25 CJS Damages § 80 at 888 (1966); Section 32–03–09, NDCC
> (measure of damages for breach of contract); Section 32–03–20, NDCC (measure of
> damages for tort).

Merrill Iron & Steel v. Minn–Dak Seeds, Ltd., 334 N.W.2d 652, 656 (N.D.1983); see also Delzer v. United Bank, 1997 ND 3, ¶17, 559 N.W.2d 531.

In all instances, regardless of whether the claim is for breach of contract or tort, damages must be reasonable and cannot be based upon speculation.  E.g., Swain v. Harvest States Cooperative, 469 N.W.2d 571, 575 (N.D. 1991); N.D.C.C. § 32-03-37 (damages must be reasonable).  This is particularly true when it comes to claims for lost profits.  See id.  However, neither uncertainty as to the exact amount of damage nor evidentiary imprecision in the available proof will preclude recovery.  E.g., Red River Wings, Inc. v. Hoot, Inc., 2008 ND 117, ¶ 42, 751 N.W.2d 206; Martin v. Trinity Hosp., 2008 ND 176, ¶¶ 29-31, 755 N.W.2d 900.  A plaintiff may offer inexact evidence on the amount of damages but only if there is not definite evidence available for a more exact determination.  See id.

Finally, N.D.C.C. ch. 32-03 provides more particular measures of damages for certain breaches of contract or torts.  These provisions trump when applicable.

**B.      SmartLease's evidence of the purported market value of the Abelmann 110 acres on or about March 1, 2013, is irrelevant**

With respect to its claims against the Abelmanns as well as its tort claims against the third-party defendants, SmartLease appears to have several alternative damage numbers.  One or more rely upon what SmartLease claims was the market value of the Abelmann 110 acres on or about March 1, 2013, as part of the damage calculation.  SmartLease's argument as to why the market value on that date is relevant is essentially:  (1) SmartLease was constructively evicted from the leased acres as of March 1, 2013, by the Abelmanns' notice of lease termination; and (2) what SmartLease lost on that date was what amounts to the fee market value of the property, since it had a lease that could be renewed for up to 99 years as well an option to purchase.

SmartLease appears to want to prove the market value of the 110 acres in two ways. The first is to introduce evidence of purported offers to purchase some or all of the property and let the jury extrapolate from this evidence the value of the property with or without the assistance of expert opinion evidence. The second is to offer expert opinion evidence that arrives at a market value by using some sort of replacement cost approach that involves valuing the 110 acres as raw land without any improvements and then adding what it would cost to put in place purported improvements and entitlements added by SmartLease that it contends added to the tract's value.

In the court's estimation, these two methods of arriving at market value have their own problems in this instance that will be addressed separately below. However, there is a more fundamental problem—which is that SmartLease did not treat the lease termination notice as a constructive eviction and relinquish possession of the property on or within a reasonable time after March 1, 2013. Rather, as outlined in detail earlier, SmartLease argued that its lease had not terminated and remained in possession, albeit suffering to some degree from the Abelmanns' interference with its lease rights. In fact, for a period of some fifteen months, it was the prevailing party in state court based on its argument to the state court that the lease had not terminated because it had committed no material breach. Further, during much of the time SmartLease remained in possession, it continued to use the property in an attempt to generate some income and continued its efforts to further develop and market the property.

The generally accepted rule is that a tenant cannot claim constructive eviction for a landlord's interference with quiet possession unless the tenant within a reasonable time after the claimed act(s) of interference relinquishes possession of the property. See, e.g., Bloch v. Frischholz, 587 F.3d 771, 778 (7th Cir. 2009) (en banc) ("[I]t is well-understood that constructive eviction

requires surrender of the premises by the tenant.  [citing authority omitted]  If the tenant fails to vacate within a reasonable time, she waives her claim for constructive eviction."); <u>Gray v. Oxford Worldwide Group, Inc.</u>, 139 P.3d 267, 270 (Utah Ct. App. 2006) ("[T]o claim constructive eviction, a tenant must abandon the premises within a reasonable period of time after the alleged interference."); <u>Andrews v. Mobile Aire Estates</u>, 125 Cal.App.4th 578, 590 (Cal. Ct. App. 2d Dist. 2005) (a tenant can elect to treat a landlord's deprivation of beneficial enjoyment of the leased premises as a constructive eviction and surrender possession or "stand upon the lease, remain in possession and sue for breach of contract damages") (internal quotations omitted); <u>Strupp v. Canniff</u>, 150 N.W.2d 574, (Minn. 1967) ("It is settled law that a tenant may not invoke the defense of constructive eviction unless he vacates the premises."); <u>see</u> <u>generally</u>, 52A C.J.S.. <u>Landlord & Tenant</u> § 1062 (March 2020 update) ("Where there is constructive eviction, the lessee may, on abandonment of the premises, pursue one of the remedies given by law for an eviction."); <u>Time Within Which Tenant Must Yield or Abandon Premises After Claimed Constructive Eviction</u>, 91 A.L.R.2d 638 (noting the requirement for lessee abandonment and collecting cases addressing whether abandonment was timely).

The parties have not cited to a North Dakota case that is on point nor is court aware of one. However, there no reason to believe the North Dakota Supreme Court would not follow the generally accepted requirement of timely lessee abandonment for a claim of constructive eviction. Further, as applied to this case, there is no reason to believe the North Dakota Supreme Court would (1) ignore the several years during which SmartLease continued to use and speculate with the leased premises following the notice of lease termination, and (2) allow it to go back in time  and collect damages based upon a total deprivation of use of the property as of March 1, 2013.

To be clear, the court is not concluding the Abelmanns did not interfere with SmartLease's use and enjoyment of the property. There clearly was interference. The only thing being decided here is that whatever recovery SmartLease may be entitled to if the jury concludes the Abelmanns were not justified in declaring the lease to have terminated as of March 31, 2013, is that the market value of the leased premises on or about that date is not relevant given that SmartLease did not within a reasonable time treat the lease termination notice as an eviction, constructive or otherwise, and abandon the lease premises.

### C.   Damages based upon a purported inability to exercise the option to purchase all or part of the Abelmann 110 acres are not recoverable

SmartLease contends that not only did the lease termination notice deprive it of use of the lease acreage, but also that it lost the value of the embedded option to purchase the property. However, as detailed above, SmartLease took the position after March 1, 2013, and up until very recently, that the lease and option had not terminated. Consequently, even if the court would permit a damage claim based on the claimed loss of the option to purchase, it would not permit the damages to be based upon the market value of the property as of March 31, 2013. The precedents just discussed apply to the embedded option as well—at least by analogy. In other words, without having treated the option as terminated at the time and continuing to litigate it was still effective, SmartLease may not go back in time and claim damages for the purported loss of the option as of March 31, 2013. Further, to hold to the contrary would lead to the peculiar result of SmartLease being held to have elected to stand on its lease, but not on the embedded option.

In addition, there are more fundamental problems with SmartLease's claim for damages based upon a purported loss of the opportunity to exercise the option. First, it is clear that SmartLease lacked the financial resources to exercise the option (Doc No. 199-7, p. 342), and it is

only speculation that it would have been able to put together a deal that would have allowed it to do so.  SmartLease points to the purchase agreement it had entered into with DG Developments just after obtaining the option.  However, DG Developments never purchased the property and, as discussed earlier, the agreement amounted to little more than an option.  SmartLease also points to other "offers" that it received as evidence that it would have been able to market the property for a price that would have allowed exercise of the option.  However, as discussed earlier and returned to again in a moment, these "offers" were even more ephemeral.

Second, SmartLease never exercised or attempted to exercise the option.  SmartLease argues it did not have to in order to be able to recover given the Abelmanns' repudiation of the lease.  In support, SmartLease cites Tenant's Rights Under Unexercised Option to Purchase as Affected by Landlord's Breach of Lease or Lease Agreement, 12 A.L.R. 3d 1128  (1967).  However, as made clear by this annotation, the authority supporting SmartLease's argument is sparse.  In fact, except for a couple of cases in which the courts were able to conclude that exercise of the option was clearly futile, it may come down to a single Oregon Supreme  Court case for which there was a dissenting opinion and which the court does find to be persuasive.  See id.

There does not appear to be any North Dakota case law on point.  The undersigned concludes the North Dakota Supreme Court would not follow the authority SmartLease relies upon—such as it is.  Rather, the North Dakota Supreme Court would conclude that, when a lessee takes the position the lease and option have not terminated, there must be an attempt to exercise the option before being able to claim damages for its loss.  Further, even if the North Dakota Supreme Court would not so hold in all cases, it would in a case where the lessee clearly lacked the financial resources to exercise the option and it is mere speculation as to whether it would have been exercised.  Or,

30

alternatively, before a party would be excused from not having attempted to exercise the option, it must demonstrate it had the ability to do so if that is questioned.[8]

This case is a good example for why an attempt to exercise the option should be required. Such a rule imposes no additional obligation. It requires only that the person holding the option do what is otherwise required to take advantage of it and eliminates the possibility of a windfall—a real possibility in this case.

### D.   Even if the market value of the Abelmann 110 acres is somehow relevant, SmartLease will not be permitted to rely upon its "offer" evidence to prove market value

SmartLease wants to get before the jury evidence of the offers it claims to have received for purchase of all or part of the Abelmann 110 acres—either by introducing the evidence directly or by its expert witness testifying about the offers in support of an opinion of value of the leased acreage.  The use of unaccepted offers to purchase real estate as proof of market value, however, is viewed with skepticism and it appears that most often courts have concluded such evidence is not a competent basis for establishing market value.  See, e.g., Sharp v. U.S., 191 U.S. 341, 348-50 (1903); Geck v. A.W. Wentz, 133 N.W.2d 849, 851 (N.D. 1965); Unaccepted Offer for Purchase of Real Property as Evidence of its Value, 25 A.L.R.4th 571 (1983) (compiling cases and concluding the general rule is that unaccepted offers to purchase real property are inadmissible).  The commonly expressed reasons include:  offers by their nature inherently are speculative and unreliable; the offers

---

[8]  While not required for the above holdings, the court concludes the exercise of the option would not unequivocally have been futile in this case notwithstanding the lease termination notice and Abelmann's deposition testimony that he would not have sold anything more than 10 acres.  Even if one was to credit Abelmann's after-the-fact testimony, he might very well have changed his mind not only with cold hard cash in front of him but also after receiving advice from his attorneys about the costs of continued litigation, the litigation risks (including the potential impact of the perjured testimony of his wife as well as EHS's assistance leading up to and including the drafting of the lease termination notice), and other factors.

may not have been made in good faith; the person making the offer may have been uniformed or misinformed; the person making the offer may have wanted the property for a particular purpose disconnected from its value or simply to speculate in hopes that the value might increase or return a profit; and the inability to cross-examine the party making the offer. See id.

After careful consideration of SmartLease's "offer" evidence in light of the circumstances of this case, the court concludes that these oft-cited reasons for why such evidence should not be considered apply in this case. For these reasons, the court would not allow the jury to hear the evidence or allow opinion testimony of value based on it.

Further, even if under other circumstances the court would be inclined to permit consideration of "offer" evidence, there are problems with the individual items of evidence that SmartLease wants to rely upon in this case. Putting aside for the moment the DG Developments evidence, all of the other "offers" were clearly preliminary and not binding. Also, one or more of the offers were for limited acreage and there are substantial questions with respect to scaling up the numbers being discussed to the entire tract, including rank speculation. Finally, the value that SmartLease wants to attribute to one of the offers is based upon what SmartLease believes it might earn on the property over time and was totally speculative.

SmartLease contends the DG Developments evidence is different in that it resulted in a signed purchase agreement. The DG Developments evidence, however, has its own problems. These include:

- The purchase agreement in reality was little more than an option, given that DG Developments had the right to back out of the agreement for any reason. And, in fact, DG Developments did back out within the period allowed for it to do its due

diligence.

• The SmartLease principals are of the understanding that one of the reasons why DG Developments decided not to proceed with the purchase was because of the lack of sufficient sewage treatment capacity.  It is mere speculation as to how important a factor that was in terms of the price set forth in the purchase agreement.

• DG Developments may have had other reasons for not proceeding with the purchase. After doing its due diligence, it may have decided the price was too high relative to what it would be getting, particularly given the dodgy sublease with EHS.  It may have taken a harder look at the market and had concerns about the demand being sufficient for a large mobile development at this location given it distance from Williston and Watford City—the two closest towns of any size providing amenities that may be important to the residents.  In fact, during this time frame, Guthrie expressed his concern to the other SmartLease principals that the market for housing may becoming saturated and that any deal they struck should be for cash with maybe some future residuals.  (Doc. Nos. 199-5, pp. 145–47).  In other words, get out while the getting may be good.  Also, Guthrie stated to the other SmartLease principals: "I do  not see our land as being the best developable land in the immediate vicinity." (Doc. No. 199-7, p. 184).

In short the court concludes that the DG Developments purchase agreement is simply too speculative and unreliable to be used as a basis for proving the market value of the Abelmann 110 acres.[9]

---

[9] Finally, while the court would exclude consideration of the SmartLease "offer" evidence for the reasons
(continued...)

**E.      What SmartLease might have earned under a possible joint venture with DG Developments is rank speculation**

One or more of the SmartLease principals have testified that, with DG Developments not having purchased the property, what SmartLease lost by the Abelmanns' interference with its quiet enjoyment of the leased premises is what it would have earned under a joint venture with DG Developments.  They claim the loss is in the millions.

It is not clear whether SmartLease's attorneys intend on offering evidence of loss based upon what might have been earned on a joint venture with DG Developments.  But, in any event, the evidence  is nothing more than rank speculation.  For one thing, no joint venture agreement was actually entered into and we have no idea as to its terms.  In fact, the SmartLease principals were hard pressed in their deposition testimony to recount even the general outlines of what had been discussed with DG Developments.  Further, this would have been a new business with no history of earnings upon which to make even an guestimate as to lost profits.  Finally, while this is enough to conclude the loss-of-joint-venture evidence is too speculative, a market for housing that is dependent upon oil exploration, drilling, and production is inherently speculative.

**F.      The amounts that SmartLease spent on "improving" the Abelmann 110 acres are  of doubtful admissibility**

SmartLease claims in its damage disclosures that it spent some $690,000 improving the Abelmann 110 acres.  In the motions now before the court, the Abelmanns and the third-party defendants seek to exclude evidence of these costs on procedural grounds, claiming SmartLease's

---

[9](...continued)

expressed above, the court has another concern.  Whatever might be the merits of permitting an independent appraiser to consider one or more of the items of "offer" evidence in reaching a conclusion as to value, what SmartLease offers is a purported expert opinion by one its own that appears lacking in professional rigor and is nothing more than an attempt to get  large numbers before the jury.

disclosures are not sufficiently detailed as to this item, and on relevancy grounds.  In response, while SmartLease defends the adequacy of its disclosures, it does not cite the court to any authority for why these costs would be recoverable as an item of damage.  (Doc. Nos. 209, 212).  In fact, SmartLease appears to concede that the general measure of damages for breach of the covenant of quiet enjoyment  under North Dakota law is the difference between the value of the use of the property and rent reserved or, in the alternative, lost profits if they can be demonstrated, citing Platou v. Swanton, 230 N.W. 775, 728 (N.D. 1930).  (Doc. No. 212, p. 13, n.9).  Further, the court has difficulty understanding how what Smartlease spent is relevant given that it ignores the substantial period of time it made use of the property including its opportunity to speculate with it.

Finally, there are significant problems with how SmartLease wants to go about proving what was spent on improving the property.  For example, while not entirely clear, it appears that part of the proof are estimates by SmartLease principals that are based in part upon the amounts that each contributed to the business on the assumption it was all spent on improving the property.  However, there is reason to believe that some of the money was spent on other things.  Further, while estimates are sometimes admissible and imprecision is not always a basis for excluding damage evidence, these principles apply under North Dakota law as summarized earlier only when evidence that allows for a more exact determination is not available.  And here, there is at least the checkbook evidence.  In other words even if the court concludes going forward that what SmartLease spent is admissible for some purpose, it should not proceed under the assumption that guesstimates by SmartLease principals of what was spent would be sufficient in this case.

### G.        Motion to exclude the opinion testimony of Erik Peterson

SmartLease has served a disclosure pursuant to Fed. R. Civ. P. 26(b)(2) that purports to set

forth opinion testimony of Erik Peterson who partnered with SmartLease for the continued use, further development, and marketing of the 110 acres after the Abelmanns served their notice of lease termination. The disclosure suggests that Peterson will be offering an expert opinion as to the value of the Abelmann 110 acres as of March 1, 2013.

The Abelmanns seek to exclude Peterson's opinion testimony on both substantive and procedural grounds. In addition, the opinion with respect to the value of the Abelmann 110 acres in terms of its relevancy is encompassed within one or more of the other motions in limine seeking to exclude or limit SmartLease's damage claims.

Peterson's expert disclosure is just over three pages. The first page sets forth Peterson's background and qualifications.

The second page sets forth Peterson's opinion(s) as to the value of the Abelmann 110 acres as of March 1, 2013, as follows:

SMART LEASE EXPERT WITNESS DISCLOSURE

| Broker Opinion of Value | Erik Peterson, Smartlease Property | March 1, 2013 |
|---|---|---|
| Land Value: 110 Acres on Highway 85 | Estimated Value on 3.1.13: Raw Land Average of $25,000 Per Acre. Highway frontage is worth up to $40,000/acre, land in the back is worth approximately $15-$20,000/acre. Average of $25,000/Acre | $2,750,000 |
| Site Improvements: | | |
| RV Hookups | 12 @ $5,000 Each | $60,000 |
| Electric Service | Additional Electric Service 3 phase power trunk line | $50,000 |
| Pad Improvement | Grade, Compact, & Gravel Site | $75,000 |
| Sewage Capacity | 100 Lots of Capacity at $3,000 per year- ($.065/gallon day, 125 gallons/day=@365 days) | $300,000 |
| Water | On Site Well Cost | $10,000 |
| Comprehensive Plan | Added Value of Being on McKenzie County Plan | $50,000 |
| Estimated TOTAL OF LAND | | $3,295,000 |
| Value of Contracts on Property | | |
| Hegg Offer: 1/26/13: $45,000/Acre @ 110 Acres | | $4,950,000 |
| Greg Hancock Offer: 11/14/12: $50,000/Acre @ 22 Acres | | $1,100,000 |

| Don Gibson & EHS: 1/03/13: $70,000/Acre @ 110 Acres-Performance Lease | $7,700,000 |
| Don Gibson & EHS: 1/26/13: $35,000/Acre @ 110 Acres | $3,500,000 |

(Doc. No. 199-4).

At least one of Peterson's opinions is that the Abelmann 110 acres was worth $3.275 million as of March 1, 2013. Peterson arrives at this value by first determining the "raw value" of the land, which he claims on the average was worth $25,000 per acre or $2.75 million for the 110 acres. In arriving at an average per acre value, Peterson opines that the raw land value of the acres bordering upon U.S. Highway 85 was more than for the acres that are set back. Given the magnitude of the per acre values considered, they obviously are not based upon the property being used for farm or pasture land. Further, given the range of values considered and proximity to U.S. Highway 85 being a consideration, most likely the values reflect the potential not only for residential development but also some commercial or industrial development. This much may be surmised. What the disclosure fails to explain is how Peterson got to the per acre values that are used to determine the average.

After arriving at the "raw land" value, Peterson adds what appears to be estimates of the installation costs of what he deems to be improvements to the property and ultimately arrives at an estimated land value of $3.275 million. Below that on page 2, there is a listing of the "offers" that SmartLease received prior to March 1, 2013 and opposite each offer are numbers that appear to be opinions of what the offers would suggest was the value of the 110 acres. It is unclear, however, whether these additional opinions will be offered as to the market value of the 110 acres thereby making Peterson's ultimate opinion being that the 110 acres was worth on the low end $3.275 million and the high end $7.7 million—quite a range. Or, whether the "offer" evidence is simply being used in some unexplained way to arrive (or confirm) the estimated land value of $3.275 million.

37

The third page of the Peterson disclosure is a table listing what purport to be comparable sales with one column of the table carrying over to a fourth page, which contains nothing else. For each listed comparable, the table sets forth the date of sale, the address of the property, the number of acres, the sales price, and the price per acre. However, there is nothing in the table that identifies the character of the listed tracts (*i.e.* whether the tract is residential, commercial, or industrial) or that states whether the tracts have been developed, including whether they have buildings. Further, there is completely absent from the disclosure any explanation for why the tracts are comparable, much less why they support the opinion(s) of value being reached. Finally, it appears that all of the comparables are located in, or are in the immediate vicinity of, Williston or Watford City, North Dakota   None appear to be in the immediate area of the  Abelmann property, which is near Alexander—a small town that offers little of the amenities of Williston or Watford City.

Putting aside the procedural deficiencies in the Peterson disclosure, there are several reasons why the court will exclude Peterson's testimony. First, for reasons already explained, the value of the property as of March 1, 2013, is not relevant for any measure of damages the court might be willing to allow the jury to consider. Second, Peterson's estimate of value necessarily assumes exercise of the option since (1) there is nothing to indicate the opinions reflect the value of the lease, and (2) the lease that SmartLease obtained permitted only residential development. And, as already discussed, the court will not allow the jury to consider a claim for damages based upon loss of the ability to exercise the option. Third, not only are any opinions of land value as of March 1, 2013, based upon SmartLease's "offer" evidence not relevant, the "offer" evidence is not a competent basis for determining the market value—at least not in this case.

Since this appears to cover the waterfront of Peterson's opinion(s), the court will exclude

Peterson's testimony.  That is not to say, however, there not also substantive concerns.  The court has serious reservations about the methodology that Peterson has employed generally as well as more particularly the process he may have employed to  determine the purported "raw land" value, how the replacement costs for the purported improvements were determined, and whether there is a reasonable basis for concluding the improvements actually added value to the land—particularly since the average per acre  "raw land" values already obviously reflected the potential for development.  The court notes with respect to the purported improvements:

- As of March 1, 2013, there was not existing sewage capacity installed on the property for the 300 mobile home lots that SmartLease was planning.  All that SmartLease had was an ill-defined promise by EHS in its sublease that it would provide sewer capacity for 100 lots per year for three years.  Also, this promise was possibly subject to an additional volume limitation that may have reduced the number of residential units that could be served as a practical matter.  Further, as of March 1, 2013, disputes had arisen between SmartLease and EHS with respect to both party's performance and the only thing that a buyer might be getting was a lawsuit over an incomplete, vague and otherwise poorly drafted sublease.  Or, to put it another way, it is highly doubtful that any competent investor would have been willing to proceed based on the dodgy 1½ page sublease that was in place, much less assign substantial value to it.

- The opinion includes amounts for RV hookups and the pad for the RV Park that SmartLease had already concluded by March 1, 2013, was going to be phased out because of lack of demand for its primitive camp as well as the fact that its large

39

development was going to require redoing the area.  In addition, SmartLease had already concluded it did not make economic sense to upgrade the RV Park because of market conditions.  In view of these facts, it not clear what added value the RV hookups and the pad for the RV parking would have had.

- As of March 1, 2013, the only designation made by McKenzie County was that the Abelmann property was included on a planning map for possible residential development.  There was not in place the zoning and special use permits that would have been required for a mixed residential and commercial development that Peterson's estimates of land values clearly contemplate.  (Doc. Nos. 199-7, pp. 185-86; 199-8, pp. 103-04).  Peterson's conclusion that  simply being on the planning map for residential development added $50,000 in value is questionable and, unless there is more of a basis for it, unduly speculative.

- While claiming the benefit of the sewage treatment capacity purportedly accruing to the property under the sublease with EHS, Peterson calculated his estimated land value based upon the entire 110 acres and did not deduct the acreage occupied by EHS.  The sublease allowed EHS to occupy up to 8 acres.  If that was the amount of acreage used, this would amount to  $200,000 at $25,000 per acre.  However, there is some evidence that EHS had exceeded its allowable acreage and was occupying up to 13 acres.  (Doc. No.  199-8, p. 272).  If so, this would call into question an *additional* $125,000 in Peterson's estimate.[10]

Because of all of this, even if the fee market value as of March 1, 2013, was somehow relevant, the

---

[10]  If one backs out the questionable additions to value as well as another $300,000 or so for EHS's sublease acreage, the estimated market value gets down to $200,0000 above what it would cost to exercise the option to purchase

court would have to conduct a hearing to determine whether any deficiencies in Peterson's opinion should simply go to it weight and be a matter for cross-examination or whether Peterson's work is so flawed that it is unreliable and would have to be excluded pursuant to Fed. R. Evid. 702.

Finally, the court agrees that Peterson's opinion disclosure is deficient. In <u>Novotny v.</u> <u>Weatherford International, LLC</u>, No. 1:16-cv-260, 2017 WL 5987826 (D.N.D. Oct. 25, 2014), this court explained:

> Federal Rule of Civil Procedure 26(a)(2)(B)(i)-(ii) requires that, if a party retains an expert witness to provide testimony, the party must disclose: "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."
>
> The purpose of Rule 26(a)(2)(B)'s disclosure requirement is to shorten, or eliminate the need for, expert depositions. <u>See</u> <u>Scylla-Sawdon v. Uniroyal Goodrich Tire Co.</u>, 47 F.3d 277, 284 (8th Cir. 1995). * * * *
>
> An expert report that merely sets forth conclusions fails Rule 26(a)(2)(B)'s requirements. Rather, a report must explain the chain of reasoning that adequately connects the facts and data to the expert's conclusions. <u>United States ex rel. Tennessee Valley Auth. v. 1.72 Acres</u> <u>of Land in Tennessee</u>, 821 F.3d 742, 751 (6th Cir. 2016); <u>R.C. Olmstead, Inc. v. CU</u> <u>Interface, LLC</u>, 606 F.3d 262, 271 (6th Cir. 2010) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."); <u>Salgado by Salgado v. Gen. Motors Corp.</u>, 150 F.3d 735, 741 n. 6 (7th Cir. 1998) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.").

<u>Id.</u> at **4-5. And here, Peterson's disclosure is deficient in several respects. First, it does not set forth salient information about the comparable sales and, more fundamentally, does explain how the individual comparables support the opinion(s) being offered. Second, there is an absence of any facts or other data that Peterson relied upon to come up the replacement costs for the purported improvements. Third, there is nothing in the disclosure that explains why the "offers" to purchase were included. That is, do they purport to be additional opinions of value? Were they used somehow in arriving that estimated land value of $3.275 million? Fourth, Peterson provides no explanation for how he arrived at the value of the offers. This is of particular concern with respect

to his assignment of $7.7 million being the value of what SmartLease would earn over time under a performance lease.  Obviously, this opinion is based on a number of assumptions and an adequate disclosure on this item alone might run more than the entirety of Peterson's disclosure sans his qualifications.

SmartLease requests that it be given the opportunity to supplement the disclosure and that there is sufficient time before trial for defendants to depose Peterson.  The court need not decide these points given its conclusion that Peterson's opinion evidence will not be permitted based on its lack of relevance and it being too speculative for the reasons expressed earlier.

**H.      Motion to exclude evidence of the amount of SmartLease member investment**

The third-party defendants have moved to exclude evidence of the capital contributions of the individual principals of SmartLease.  SmartLease responds stating it is not seeking to recover the capital contributions for SmartLease's members individually but states the evidence is relevant for other purposes.  While the court doubts the evidence is relevant for any purpose as discussed above, the court is not prepared to make a final ruling now that is not admissible for any purpose, even as a point of rebuttal.

**I.      Motion to exclude evidence of future lost profits and motion to exclude any evidence of damage**

The third-party defendants have moved to exclude evidence of future lost profits and the Abelmanns have moved to exclude any evidence of damage.  At this point, the court will grant these motions for reasons already expressed to the extent of:  (1) precluding any evidence of damage in which the fee value of the Abelmann 110 acres as of March 1, 2013 is part of the calculation; (2) precluding SmartLease's claim for damages based upon the alleged loss of opportunity to exercise its purchase option; (3) precluding SmartLease's multi-million dollar claim based upon its alleged

42

loss of future earnings on a joint venture with DG Developments, and (4) precluding SmartLease's evidence of third-party offers.

On the other hand, there are damages that court might allow the jury to consider if SmartLease prevails, depending on how the evidence plays out at trial. These include (putting aside for the moment any double counting problems):

- Amounts the Abelmanns received in rent payment from tenants renting space on the 110 acres that should have gone to SmartLease.

- The lost profits (or possibly lost net revenue) resulting from the interference with SmartLease's quiet possession of the leased acres, but limited to the renting of space on the pads that had been developed and not some speculative future development of 300 mobile home lots.[11]

- Amounts EHS was obligated to pay in rentals under its sublease.[12]

- Rent for spaces that EHS used and occupied on the upper and lower pads.

- Nominal damages if any other damages are not proved.

It appears these damages can be proved without an expert and, under North Dakota law governing

---

[11] There is all of the evidence outlined earlier that SmartLease let the occupancy in the RV Park dwindle for reasons unrelated to any interference by the Abelmanns, including wanting to devote its limited resources to the development of a large mobile home park, concern in 2014 that actively taking in new renters for its unlicensed operation might adversely impact the zoning changes it was seeking, etc. At the end of the day, the jury might very well conclude that, if there was an actual loss, it was minimal. Further, the court will likely limit the jury's consideration to the history of the amounts charged or contractually agreed to and not what SmartLease might have charged. Finally, the court is likely to limit the time frame that the jury can consider.

[12] SmartLease in one of its briefs sets forth a calculation of these damages that is substantially the same as testified to by one or more of its principals, except for the length of time for which recovery of damages is sought. The calculation in SmartLease's brief is for 7 years from 2013 to 2020. While the court makes no ruling now, it has difficulty understanding how the calculation could go beyond October 2016 when SmartLease took no steps to renew its lease. Further, assuming any defaults by Smartlease of its obligations under the sublease are excused or are not otherwise a bar to its collecting damages for the lost rental (which may be a big "if"), the jury will have to decide when reasonably the lots should have been completed and occupied.

damages as summarized earlier, neither uncertainty as to the exact amount of damage nor evidentiary imprecision is a basis for excluding the damage evidence. In addition, the court concludes that the Abelmanns and third-party defendants have sufficiently been put on notice that these damages are being claimed and have had sufficient discovery to allow them to defend against the claimed damages at trial. Finally, with respect to certain of the damages, some of the documentary evidence has only recently been turned over to SmartLease in discovery.

J.    **SmartLease's remedies are limited by the speculative nature of its venture, its lack of working capital, and the choices it has made after receiving the lease termination notice and during the course of the litigation**

The opportunities that SmartLease pursued in coming to North Dakota during the height of the Bakken boom were speculative by their very nature and made even more so by its lack of working capital. But, these are not the only things that will have left SmartLease with remedies it undoubtedly will consider inadequate and unfair with the rulings set forth in this order. SmartLease made choices after receiving the lease termination notice and during the course of the litigation. It now has to live with these choices.

For one thing, SmartLease could have elected to treat the lease termination notice as a constructive eviction, relinquished possession of the property, and took its chances in court. If it had done so rather than continue to maintain that the lease and option were still in existence and speculate with the property, then, perhaps, the claim for damages might have been in a different posture—putting aside the difficulties of proof.

Also, if the market value of the property was as great as SmartLease now claims, it could have attempted to exercise the purchase option—even after the lease termination notice. The Abelmanns might very well have acquiesced with cold hard cash on the table notwithstanding the

existing disputes.  The fact that SmartLease lacked the financial resources to exercise the option is its problem.

Finally, SmartLease has made certain choices during the course of the litigation with respect to potential remedies.  SmartLease could have pursued to conclusion its claim of specific performance not only to allow it to exercise the option (if the Abelmanns had rejected a tender of the option amount prior to its lapse by its terms or possibly even later based on an equitable extension) but also, even without the option, continue the lease, which, after all, was renewable for up to 99 years.  In the situation here, where SmartLease elected to stand on its lease and not timely treat the interference as a constructive eviction, the most viable remedy would have been specific performance.  This is because a damage remedy would likely have been inadequate not only for the Abelmanns' refusal to honor the option if exercised but also the fact that the lease contemplated a development of the property that, in large measure, was  speculative by its nature thereby making proof of damages difficult in the event of an Abelmann breach.  Cf., e.g., Wolf v. Anderson, 334 N.W.2d 212, 215–16 (N.D.  1983); N.D.C.C. § 32-04-09.  SmartLease's abandonment of its claim for specific performance (recently or potentially earlier as practical matter by letting the option and later the lease lapse) is a decision it made.  (Doc. No. 210, p. 2, n.1).  The same is true for its abandonment of one of its potential tort remedies.  (Doc.  No. 212, p. 5, n.1).

### K.      The parties are strongly encouraged to renew their efforts to settle

While the parties are entitled to their day in court, they are strongly encouraged  to renew their settlement efforts, including circling back with retired Magistrate Judge Klein.  Since the court has spent considerable time reviewing the lengthy depositions and exhibits, it will offer several observations that the parties may want to keep in mind  in making sound business judgments going

forward if that is the desired goal.

First, any money spent going forward (which will be substantial given the complexity of the case both legally and factually) may never be recovered and the attorneys fees and much of the costs expended to date may already be under the bridge.

Second, each of the parties needs be concerned that this case is so complicated factually that the jurors (who will be listening to the testimony once as it goes by quickly) will have difficulty absorbing the mountain of evidence and coming to the right factual determinations from each parties' perspective.   Also, legal and evidentiary issues in this case are seemingly unending and difficult, particularly with the untimely death of Leanne Abelmann and the question of whether her "diary" entries are admissible.  In short, the risk of jury and/or court error is not insubstantial.

Third, the upcoming trial might very well not be the last stop.  There is the possibility of an appeal as well as the possibility of a retrial if the court or jury errors and even further appeals.  Of course, the parties are well familiar with the lack of rapidity of the legal process given their experience before the state court, which in the undersigned's opinion should never have been abandoned.

Fourth, at least to some degree, the parties have only themselves to blame for where things are now.  In particular, the parties would have benefitted from obtaining competent legal assistance before entering into the agreements that were consummated. While it would not have cured the underlying speculative nature of what went on, it likely would have changed the course of the resolution of the disputes that have arisen.  Among other thing, with competent legal assistance:

- • The parties might have contractually provided for the recovery of attorney fees and costs in their agreements.

46

- The Abelmanns may have been successful in negotiating indemnification provisions backed by insurance or personal guarantees of the SmartLease principals—which provisions might also have clearly flowed down to any sublessee.  And, if unable to obtain better protection because SmartLease could not or would not provide it, they might have been advised to deal with an entity that was adequately capitalized and that either could provide additional protection or at least had the financial resources to back the promises that were made.  Now, even if the Abelmanns prevail, they are left with a mess (including further legal uncertainty with respect to EHS) and a defendant (*i.e.* SmartLease) that is likely judgment proof.

- SmartLease could have negotiated for similar protections with EHS and at the very least ended up with an agreement that was more encompassing, less vague, and that set forth concrete milestones for EHS's performance.   In fact, for any serious purchaser or investor, the dodgy 1½ page sublease was likely an impediment to any deal between SmartLease and a third party going forward.  Also, SmartLease may have benefitted from better default provisions in its lease with the Abelmanns, including a requirement for notice and an opportunity to cure.

- EHS could have insisted that SmartLease obtain from the Abelmanns a subordination of their rights to the sublease.  Why EHS constructed the facilities it did based only on the sublease is inexplicable.  Also, EHS too would have benefitted from a better drafted and less vague sublease.

Finally, none of the parties should proceed on the assumption that going into the trial they occupy the moral high ground.  Without ruling on what evidence the jury will actually hear, the

47

court notes:

- The false testimony of Leanne Abelmann during the state-court eviction proceeding including Dan Abelmann sitting there and apparently not advising his attorney that the testimony was false. In addition, EHS's Ray Wurth was present at the hearing. He apparently made no attempt at any point later to advise his attorney, who at the time was one of the attorneys representing the Abelmanns, that Leanne Abelmann had testified falsely.

- EHS's Wurth has played fast and loose with certain representations he has made in this case, which is the subject of a prior order. (Doc. No. 185). In addition, a jury might very well find unbelievable Wurth's professed inability to recall much, if anything, about his contacts the Abelmanns prior to their issuance of the lease termination notice and what was discussed— particularly when contrasted with his professed ability to recall other matters. (Doc. No. 165-1, pp. 50–62).

- When SmartLease approached the Abelmanns about getting an amendment to the lease, it appears one or more of its principals gave assurances that SmartLease would be in the future development of their property for the long haul. The truth of the matter, however, was that SmartLease's principal focus at that the time was in striking a deal with DG Developments to flip the property and get out. (Doc. No. 199-5, p. 147). Also, after the state district court ruling came down and stated that SmartLease's investment in the property was $500 K, one of SmartLease's principals in reading the court's written order to the person, who was then marketing the property for Smartlease, deliberately substituted the word "millions" for $500 K with

48

the hope that the higher number as purportedly coming from the court would be communicated to potential investors. (Doc. No. 199-5, pp. 160–67). Finally, as detailed earlier, there is SmartLease's flouting of state licensing requirements as well as what appears to be its less than frank responses to state officials when they inquired about the status of SmartLease's development efforts.

III.   **ORDER**

Based on the foregoing:

1.   The motion in limine seeking to exclude the opinion testimony of Erik Peterson as disclosed (Doc. No. 197) is **GRANTED**.  Erik Peterson is precluded from offering an opinion of the value of the Abelmann 110 acres as of March 1, 2013, and is further precluded from discussing the purchase "offers" set forth in his opinion disclosure.

2.   The motion in limine seeking to exclude evidence of the capital contributions of the SmartLease principals (Doc. No. 191) is **GRANTED IN PART** but only to the extent of precluding SmartLease from introducing evidence of the capital contributions of the SmartLease principals for purposes of recovery by the individual members. The remainder of the motion is **DENIED WITHOUT PREJUDICE**.

3.   The court **GRANTS IN PART** the motion in limine seeking to exclude evidence of future lost profits (Doc. No. 189) and the motion in limine to exclude all evidence of damages (Doc. No. 195) as follows:

   a.   SmartLease may not offer evidence of damages calculated all or in part using the fee value of the Abelmann 110 acres as of March 1, 2013;

b.      SmartLease may not offer evidence of damages for the alleged loss of opportunity to exercise its purchase option;

c.      SmartLease may not offer evidence based upon it claimed loss of not being able to proceed with a joint venture with DG Developments; and

d.      SmartLease may not offer evidence of the third-party purchase offers.

The remainder of the two motions in limine are **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

Dated this 13th day of May, 2020.

_/s/ Charles S. Miller, Jr._
Charles S. Miller, Jr., Magistrate Judge
United States District Court